## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CLASS 1 PLAINTIFFS – TARGETED FOR EMINENT DOMAIN | ) ) ) | Case No. |
| Laura D. Urban<br>370 E. Comet Rd.<br>Clinton, Oh 44216 | ) ) ) ) ) | |
| Jonathan Strong<br>2730 Seville Rd<br>Rittman, OH 44270 | ) ) ) ) | |
| Constance Jane Carl<br>Susan Wilma Deitrick<br>445 Ott Drive<br>New Franklin, OH 44216 | ) ) ) ) ) | **COMPLAINT TO<br>VACATE THE FEIS<br>FOR INJUNCTIVE RELIEF<br>AND FOR DECLARATORY RELIEF** |
| Randy Watt and Victoria Stefan Watt<br>6338 Grove Road<br>New Franklin, OH 44216 | ) ) ) ) | |
| Linda K. Lahr<br>1777 Lake O Pines NE<br>Hartville, OH  44632 | ) ) ) ) | |
| Janette J. Henrey<br>371 Ott Dr.<br>Clinton OH  44216 | ) ) ) ) | |
| Dennis W. & Patricia A. Plummer<br>5425 Thursby Rd.<br>North Canton OH  44720 | ) ) ) ) | |
| Victor  Giaconia<br>2833 Harpster Rd<br>Rittman, OH  44270 | ) ) ) ) | |
| Tim and Michelle Harvey<br>6624 Manchester  Rd<br>New Franklin Oh 44216 | ) ) ) ) ) ) | |

Deborah L. & Harlan L. Oakes   )
179 E. Comet Rd       )
Clinton, Ohio 44216      )
              )
Connie S. & Patrick J. Wasik    )
433 E. Comet Rd.       )
Clinton, OH 44216       )
              )
George J. & Robin S. Pribanich   )
384 Comet Lane        )
Clinton, Ohio 44216      )
              )
Virgil E. and Wendy J. Kline    )
4774 Mayfair Road       )
North Canton OH 44720     )
              )
Elaine D. and John G. Selzer    )
2686 Wise Rd         )
North Canton OH 44720     )
              )
Joseph E. & Amy L. Bologa    )
5287 Thursby Road       )
North Canton, OH 44720     )
              )
Perry L. & Donna G. Stone    )
6296 Grove Rd        )
New Franklin, Ohio 44216    )
              )
Anthony L and Gail S Newman   )
5923 Van Buren Rd.       )
Clinton OH 44216       )
              )
Norman A. and Carol R. First    )
6071 S. Myers Road       )
Clinton, OH 44216       )
              )
Patrick M and Mary A Conahan   )
977 Killinger Rd        )
Clinton, OH 44216       )
              )
Joseph R. & Ruth A. Giacomoni   )
2880 Seville Rd.        )
Rittman, Ohio 44270      )
              )
              )
              )

2

Camelback , Ltd.                                      )
2380 Nimishillen Church Rd NE                         )
Canton OH 44721                                       )
                                                      )
Debra L. Dangelo                                      )
6792 W. Smith Road                                    )
Medina, OH  44256                                     )
                                                      )
Ricky D. and Theresa M. Scholl                        )
6904 Grove Rd.                                        )
Clinton, OH 44216                                     )
                                                      )
Todd R. & Cindi L. Starkey                            )
4828 Mayfair Rd.                                      )
North Canton OH  44720                                )
                                                      )
Jeffrey L and Denise L Aungst                         )
6761 W Smith Rd                                       )
Medina, OH 44256                                      )
                                                      )
Roy E. Hathaway                                       )
900 Killinger Rd.                                     )
Clinton  OH  44216                                    )
                                                      )
CLASS 2 PLAINTIFFS – WHITHIN BLAST                    )
ZONE OR IMPACT RADIUS                                 )
                                                      )
Paul L & Elizbeth A. Gierosky                         )
7730 Spieth Road                                      )
Medina, OH 44720                                      )
                                                      )
Ted E. Dudra Trust                                    )
1275 E. Nimisila Rd.                                  )
North Canton, OH 44720                                )
                                                      )
David W. & Catherine R. Reese                         )
1890 Charolais St NW                                  )
Uniontown, OH 44685                                   )
                                                      )
Greer Kabb-Langkamp & Ellery J Langkamp               )
465 Comet Lane                                        )
Clinton , Oh 44216                                    )
                                                      )
Donna J. Noble                                        )
1154 Lake O Pines St.                                 )
Hartville, Ohio 44632                                 )

3

Kevin P. & Darcy R. Rodgers )
14967 Clinton Rd )
Doylestown OH 44230 )
)
Paul F. and Debbie M. Fledderjohann )
1038 Killinger Rd. )
Clinton OH 44216 )
)
Joseph F. &  Deborah H. Marino )
1536 Spring Wood Lane )
Uniontown OH  44685 )
)
Michael F. Hagan )
3071 Wise Rd )
North Canton OH  44720 )
)
Coreen Y. & Kevin H. Corrigan )
2839 Wise Road )
North Canton, OH 44720-1243 )
)
Anthony D. Fienman )
899 Killinger Rd. )
Clinton OH  44216 )
)
Debora Christy )
7782 Spieth Rd. )
Medina, Oh 44256 )
)
Nicholas S & Melody Pappas )
1321 Koons Rd. )
North Canton OH  44720 )
)
)
Plaintiffs, )
)
vs. )
)
)
Federal Energy Regulatory Commission of the )
United States of America, )
888 First Street, NE )
Washington, DC 20426 )
)
Cheryl A. LaFleur,  Acting Chairman )
888 First Street, NE )

Washington, DC 20426                                    )
                                                        )
Colette D. Honorable, Commissioner                     )
888 First Street, NE                                    )
Washington, DC 20426                                   )
                                                        )
Nexus Gas Transmission, LLC                            )
c/o Registered Agent                                   )
CT CORPORATION SYSTEM                                  )
4400 Easton Commons Way                                )
Suite 125                                              )
Columbus, OH 43219                                     )
                                                        )
                          Defendants.                  )

The Plaintiffs, in the above-captioned case, hereby file this Complaint to Vacate the

FEIS, for Injunctive Relief and for Declaratory Relief, and for such other and further relief as is

appropriate under the circumstances based upon the following:

## I.       Procedural Background.

1.       On November 20, 2015, NEXUS Gas Transmission, LLC (Nexus) filed an

application (Application) with the Federal Energy Regulatory Commission (FERC or

Commission) in Docket No. CP16-22-000 pursuant to Section 7(c) of the Natural Gas Act

(NGA) and Parts 157 and 284 of the Commission's regulations.  Nexus is seeking a Certificate

of Public Convenience and Necessity (Certificate) to construct, own, and operate a new natural

gas pipeline system in Ohio and Michigan. Nexus' proposed project is referred to as the Nexus

Gas Transmission Project (NGT Project).

2.       The NGT Project consists of about 256.6 miles of pipeline composed of the

following facilities:  209.8 miles of new 36-inch-diameter natural gas pipeline in Ohio; 46.8

miles of new 36-inch-diameter natural gas pipeline in Michigan; and associated equipment and

facilities.

3.     On November 20, 2015, Texas Eastern Transmission, LP (Texas Eastern) filed an abbreviated application with FERC in Docket No. CP16-23-000 pursuant to Sections 7(b) and 7(c) of the NGA and Parts 157 and 284 of the Commission's regulations for a Certificate to construct, own, and operate a natural gas pipeline and related facilities in Ohio as well as approval to abandon by lease to Nexus the capacity created by the Texas Eastern Appalachian Lease Project (TEAL Project) facilities. Collectively the applications are referred to as the "Projects."

4.     The TEAL Project would include two main components:  4.4 miles of new 36-inch-diameter loop pipeline in Ohio; 0.3 mile of new 30-inch-diameter interconnecting pipeline Ohio; and associated equipment and facilities.

5.     The Projects' proposed aboveground facilities include five new compressor stations in Ohio; additional compression and related modifications to one existing compressor station in Ohio; five new metering and regulating stations in Ohio; one new metering and regulating station in Michigan; and minor modifications at existing aboveground facilities at various locations across Ohio.

6.     In a related matter, on November 24, 2015, DTE Gas Company (DTE Gas) filed an application with FERC in Docket No. CP16-24-000, seeking approval to lease capacity on DTE Gas's system to Nexus.  On March 11, 2016, Vector Pipeline L.P. (Vector) filed an application with FERC in Docket No. CP16-102-000, seeking approval to lease capacity on Vector's system to Nexus. Any new or modified facilities associated with these actions are proposed to be constructed under an existing Blanket Certificate or are under the jurisdiction of another agency or country.

7.      The Draft Environmental Impact Statement ("DEIS") in these cases, tracked in docket CP16-22-000, was issued July 8, 2016.  The Final Environmental Impact Statement ("FEIS") in these cases, tracked in docket CP16-22-000, was issued on or about "November 30, 2016," a copy of which is attached as Exhibit 1 and made a part hereof (Exhibit 1, due to its large size, will be filed separately as a Supplement to the Complaint), and allegedly addresses the potential environmental effects of the siting, construction, and operation of both the NGT and TEAL Projects and recommends approval of the Projects.

**II.      Summary of Causes of Action.**

8.      This Complaint seeks to overturn or vacate the FEIS and enjoin FERC from issuing a Certificate based upon Federal Rule of Civil Procedure 65 and a Declaration and recognition of legal rights between the Plaintiffs and FERC.

9.      Because the NGT Project is primarily an export pipeline, an issuance of a Certificate by FERC would violate the Taking Clause of the Fifth Amendment.  The NGT Project does not serve a public use or purpose.

10.      The NGT Project violates Plaintiffs' substantive due process rights in several respects:  the Project strips Plaintiffs of their protected interests given to them by the land use restrictions in effect where they live; the Project places Plaintiffs in jeopardy of physical injury with no consideration of Plaintiffs' safety concerns due to a lack of safety setbacks; and forces Plaintiffs to give up certain property rights to a foreign entity for that entity's financial gain.

11.      The NGT Project violates Plaintiffs' procedural due process rights.  Plaintiffs have been given false and misleading information from FERC.  This false and misleading information is designed to trick Plaintiffs into waiving their Constitutional and legal rights.

Further, the FERC process offers Plaintiffs no meaningful opportunity to contest the taking of their property and is deficient in many respects.

12.      In addition, FERC is in violation of the NGA by proceeding under 15 U.S.C. § 717f.  This section allows NEXUS to obtain a Certificate and utilize eminent domain to acquire easements.  The NGT Project is an export pipeline for which 15 U.S.C. § 717b contains the appropriate procedure.  No Certificate may issue in this case under the NGA.

13.      Further, FERC violated NEPA when issuing the FEIS because key portions are unsupported by evidence, thus rendering it arbitrary and capricious.  Under the Administrative Procedures Act the FEIS must be set aside by this Court because FERC failed to provide a "hard look" and instead gave "no look" on many key issues related to the human environment.

**III      Misleading Information Supplied to Property Owners by FERC.**

14.      From the outset, FERC has provided misleading or false information to property owners designed to mislead such owners into waiving or giving away their legal rights in aid of the Applicant.

15.      After the Application was filed with FERC by Nexus, certain property owners were notified that their properties were being targeted for siting of the Projects in Stark, Summit, Wayne, Medina and Lorain Counties, Ohio, all of which are within the Northern District of Ohio.  Under FERC regulations, 18 CFR 157.6(d)(3)(ii), landowners must be given notice which "shall include . . . The most recent edition of the Commission's pamphlet that explains the Commission's certificate process and addresses the basic concerns of landowners." The "Pamphlet" prepared by FERC "An Interstate Natural Gas Facility on My Land?  What Do I Need to Know?" a copy of which is attached as Exhibit 2 and made a part hereof, was served on property owners.  This FERC Pamphlet makes dubious legal assertions:

a.     The Pamphlet states: "It is also possible that the company will contact you to discuss obtaining an easement prior to filing the application."  Exhibit 2, p. 5   The Pamphlet fails to inform that federal appellate courts have held that the Applicant cannot develop the pipeline until after the Certificate is issued by FERC[1]), and that the FERC balancing test considers how many property owners have refused to sign an easement. [2]   The first easements acquired by Nexus were recorded in February, 2016. This was fully four months prior to the issuance of the DEIS and nine months prior to the issuance of the FEIS. Nexus has acquired easements on properties in Summit, Medina and all eleven counties across Ohio affected by the Project's route. The majority of these easements were acquired prior to the approval of the final route defined in the FEIS.  The purpose of Nexus acquisition of property at this stage is to convince FERC that there is overwhelming support for the Project, to cause property owners to waive their rights by signing documents and easements, and to stack the deck in its favor pursuant to the balancing test explained by FERC in *Jordan Cove*.

b. The Pamphlet further states on page 23, "Q: Why would the company approach me about an easement before the project is approved?  A: Because of planning and lead time, the company may try to obtain easement agreements in advance."  FERC does not advise property owners to obtain an attorney or get legal advice on such topics as rerouting the location, the value of the easement, value of work space rentals, damage to property, utility systems, structures, water wells, and trees, and diminution in value to the residue allowed in most

---

[1] *Pacific Gas Transmission Co. v. Richard's Recreational Ranch Ltd*., 9 F.3d 1394 (9th Cir. 1993); *Natural Gas Pipeline Company v. FE*RC, 765 F.2d 1155 at Footnote 14: "natural-gas company[ies] and person[s] which will be a natural gas company upon completion of any proposed construction or extension may not engage in the transportation or sale of natural gas subject to the Commission's jurisdiction, undertake construction of facilities for those facilities, **or acquire** or operate any such facilities, without a certificate of public convenience and necessity from the Commission." (D.C. Cir. 1985)(emphasis added).
[2] Jordan Cove Energy Project 154 FERC ¶ 61,190 paragraphs 33 – 36.

districts.[3]   The Pamphlet does not mention that refusing to grant an easement could impact

pipeline approval or that FERC must consider the lack of public support for a project by

easement holders.[4]

c. The Pamphlet further states: "**However, along with these rights come**

**responsibilities.  As an intervenor, you will be obligated to mail copies of what you file with**

**the Commission to all other parties at the time of filing.  In major cases, there may be**

**hundreds of parties."** (emphasis in original). Exhibit 2, p. 7. The document fails to advise that

an intervenor is the only party that can file a Motion for Rehearing and appeal to the federal

appellate courts.[5]   FERC further fails to mention that service can also be made by email and not

necessarily by U.S. Postal Service, implying that only law firms or wealthy parties can afford to

be an intervenor.  This language serves to discourage participation by the public, especially as to

intervenor status.

d. In the official Pamphlet, FERC suggests that the property owner is obligated to

mow and maintain the easement at their expense: "A ten-foot-wide corridor, centered on the

pipeline, may be mowed or cut more frequently to facilitate periodic surveys and inspections.  **In**

**cropland and residential areas the right-of-way is maintained by the landowners consistent**

**with the presence of the pipeline.**". . .   The FEIS states:

> Page 33/541 (Executive Summary ES-10)
> Land Use, Recreation, and Visual Resources:
> The land retained as new permanent right-of-way would generally be allowed to
> revert to its former use, except for forest/woodland and tree crops. Certain
> activities, such as the construction of permanent structures or the planting of trees,
> would be prohibited within the permanent right-of-way. **To facilitate pipeline**

---

[3] See *Rockies Express Pipeline LLC*, 734 F3d 424 (6th Cir. 2013).
[4] Jordan Cove Energy Project 154 FERC ¶ 61,190 paragraphs 33 – 36.
[5] 18 CFR 385.713 - Request for rehearing (Rule 713); §385.214   Intervention (Rule 214): "(3)
Any person seeking to intervene to become a party, other than the entities specified in paragraphs
(a)(1) and (a)(2) of this section, must file a motion to intervene." 18 CFR 385.214

**inspection, operation, and maintenance, the entire permanent right-of-way in upland areas would be maintained in an herbaceous vegetated state.** This maintained right-of-way would be mowed no more than once every 3 years, but a 10-foot-wide strip centered over the pipeline might be mowed more frequently to facilitate corrosion and other operational surveys.

Page 299/541
WETLANDS:
Operation of the NGT and TEAL Projects would require periodic vegetation maintenance over the pipeline centerline to facilitate aerial inspections of the pipeline and prevent roots from compromising the Wetlands 4-64 integrity of the pipeline. **The applicants would conduct annual vegetative maintenance to maintain herbaceous vegetation within a 10-foot-wide strip centered over the pipeline.** Existing herbaceous wetland vegetation would not need to be mowed or otherwise maintained, and therefore would not be permanently impacted. PSS wetlands would be allowed to regenerate but would be impacted by maintenance of the 10-foot-wide strip. In PFO wetlands, trees within 15 feet of the pipeline centerline that are greater than 15 feet tall would be selectively cut and removed once every 3 years. Therefore, by maintaining the right-of way and limiting revegetation of a portion of PSS and PFO wetlands, some of the functions of these wetlands (primarily habitat) would be permanently altered by conversion to scrub-shrub and/or PEM wetlands. Vegetation communities outside of the 10- and 30-foot-wide corridors would be allowed to transition back to pre-construction conditions.

Page 524/541:
The land retained as new permanent right-of-way would generally be allowed to revert to its former use, except for forest/woodland and tree crops. Certain activities, such as the construction of permanent structures or the planting of trees, would be prohibited within the permanent right-of-way. **To facilitate pipeline inspection, operation, and maintenance, the entire permanent right-of-way in upland areas would be maintained in an herbaceous vegetated state.** This maintained right-of-way would be mowed no more than once every 3 years, but a 10-foot-wide strip centered over the pipeline might be mowed more frequently to facilitate corrosion and other operational surveys.

    e.  The inside cover of the Pamphlet describes the "Process for Natural Gas Certificates" as an eight step process which includes Step 7: "Respond to environmental comments/Issue Final EIS" to Step 8: "Commission Issues Orders." Nowhere in those steps does FERC advise stakeholders and the general public that they have the legal right to appeal the FEIS to the U.S. District Court pursuant to the Administrative Procedures Act (5 U.S.C 702-706)

to contest the location of the proposed Project or that they should consult with an attorney with an appropriate level of experience for opposing pipelines or the proposed location.

**IV.     The FEIS conflicts with established local land use restrictions.**

16.     The City of Green, located within Summit County, has adopted a Land Use Plan and site specific zoning codes for the entire municipality.  This Plan is designed to give residents of the City of Green information and knowledge of the types of buildings and businesses that can be constructed in proximity to residences.  The zoning codes impose restrictions.  Residents of the City of Green may have relied upon the Plan when deciding where to live.  In all of the areas where the NGT Project is planned, the City of Green Land Development codes do not authorize an industrial use with a potential impact radius or "blast zones" of at least five hundred meters. City of Green Land Development codes do not authorize the Nexus Project to be built or constructed within such close proximity to residential uses, parks, commercial uses or light industrial.  The City of Green Land Development Code documents are attached as Exhibit 3, a copy of which is attached and made a part hereof as if fully rewritten herein.

17.     New Franklin, located within Summit County, has adopted a Land Use Plan and site specific zoning codes for the entire city.  This Plan is designed to give residents of New Franklin information and knowledge of the types of buildings and businesses that can be constructed in proximity to residences.  Residents of New Franklin may have relied on the Plan when deciding where to live. In all the areas where the NGT Project is planned, the New Franklin zoning codes do not authorize an industrial use with potential impact radius or "blast zones" of at least five hundred meters.  The City of New Franklin Land Use Plan does not authorize the Nexus Project to be built or constructed within such close proximity to residential

uses, parks and commercial uses.  The City of New Franklin Land Use Plan is attached as Exhibit 4, a copy of which is attached and made a part hereof.

18.     Guilford Township is located in Medina County and has adopted a Land Use Plan and site specific zoning codes for the township.  This Plan is designed to give residents of Guilford Township information and knowledge of the types of buildings and businesses that can be constructed in proximity to residences.  Residents of Guilford Township may have relied on the Plan when deciding where to live. In all of the areas where the NGT Project is planned, Guilford Township does not authorize an industrial use with potential impact radius or "blast zones" of at least five hundred meters to be built or constructed within such close proximity to residential uses, parks and commercial uses. The Guilford Township Land Use Plan is attached as Exhibit 5, a copy of which is attached and made a part hereof.

19.     The lack of compatibility with established land uses in Summit County were raised repeatedly by property owners and city officials with FERC and ignored by FERC during proceedings.  These land use issues were reserved to the local governments and the State of Ohio, which has delegated land use issues to the municipalities through the Ohio Revised Code, section 713.02.[6]  These land use issues are constitutionally protected uses of local government police powers reserved under the Tenth Amendment of the U.S. Constitution, the due process clause of the 5th Amendment, the Commerce clause, and various U.S. Supreme Court decisions

---

[6] Ohio Revised Code § 713.02 states "Whenever the commission makes a plan of the municipal corporation, or any portion thereof, no public building or structure, street, boulevard, parkway, park, playground, public ground, canal, river front, harbor, dock, wharf, bridge, viaduct, tunnel, or other public way, ground, works, or utility, whether publicly or privately owned, or a part thereof, shall be constructed or authorized to be constructed in the municipal corporation or planned portion thereof unless the location, character, and extent thereof is approved by the commission."

as well as the legislative history of the Natural Gas Act.[7]  Land use plans and zoning codes can

only be overridden under strict scrutiny and compelling reasons or due to federal preemption.  In

this case, FERC is essentially overriding the land use and zoning codes established by the

exercise of state or local police power to protect residential uses.[8]  By doing so, FERC is

imposing a dangerous industrial process, endangering the lives of citizens who have relied to

---

[7] "We have consistently recognized the legitimate state pursuit of such interest as compatible with the Commerce Clause, which was 'never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country.'" *General Motors Corp. v. Tracy*, 519 U.S. 278 ,307 (1997)(citing *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 443-444 (1960) (quoting *Sherlock v. Alling*, 93 U.S. 99, 103 (1876)). "The segregation of industries commercial pursuits and dwellings to particular districts in a city, when exercised reasonably, may bear a rational relation to the health, morals, safety and general welfare of the community. The establishment of such districts or zones may, among other things, prevent congestion of population, secure quiet residence districts, expedite local transportation, and facilitate the suppression of disorder, the extinguishment of fires, and the enforcement of traffic and sanitary regulations. The danger of fire and the risk of contagion are often lessened by the exclusion of stores and factories from areas devoted to residences, and, in consequence, the safety and health of the community may be promoted. . . . . The exclusion of places of business from residential districts is not a declaration that such places are nuisances or that they are to be suppressed as such, but it is a part of the general plan by which the city's territory is allotted to different uses in order to prevent, or at least to reduce, the congestion, disorder and dangers which often inhere in unregulated municipal development." *Village of Euclid v. Amber Realty Co*., 272 U.S. 365, 393 (1926) (citing *City of Aurora v. Burns,* 319 Ill. 84, 93). In the zoning and land use context, the Sixth Circuit has held that "[s]ubstantive due process . . . protects citizens from being subject to 'arbitrary or irrational zoning decisions." *Paterek v. Vill of Armada, Mich*., 801 F.3d 630, 648 (6th Cir. 2015). "To succeed on a substantive due process claim based on this theory, a plaintiff is required to show that '(1) a constitutionally protected property or liberty interest exists, and (2) the constitutionally protected interest has been deprived through arbitrary and capricious action." Id.
[8] Courts have determined that the NGA or Pipeline Safety Act have not preempted local property laws: "The Court finds that Plaintiffs have stated sufficient claims and that their claims are not preempted by federal law. The PSA does not preempt Ohio property or tort law. The PSA itself provides that it 'does not affect the tort liability of any person.' 49 U.S.C. § 60120(c). Further, as discussed in Abramson, 909 F.Supp. at 416, neither the PSA, nor the NGA, prevents claims based on state contract, tort, or property law. The Abramson court noted, 'that the state's areas of law relating to damages to property owners on whose property pipelines run are a legitimate state concern.' Id. at 416." *American Energy Corp. v. Texas Eastern Transmission*, LP, 701 F.Supp.2d 921, 931-932 (S.D.Ohio 2010) See footnote 7 infra.

their detriment upon these codes to acquire homes in safe residential areas or under safe conditions.

20.     Neither FERC nor Nexus have provided compelling reasons why the above referenced land use plans and zoning codes must be ignored when "environmentally acceptable" alternatives exist and no actual delivery points exist in Stark, Summit, Wayne or Medina Counties.  While Nexus in promoting its proposed route used collateral material and press release announcements identifying thirteen potential customer tee-tap locations, it was discovered that tee-taps are merely underground fittings to facilitate potential future use, not firm contracts or commitments.  Nexus materials suggest that these thirteen tee-taps represent interconnect agreements of 1.4 Bcf/d to 1.75 Bcf/d of potential use capacity, but have provided no proof of actual customers.  FERC has determined the thirteen tee-taps are not essential to the Project.  The July, 2016 FERC DEIS stated at page 42: "We consider the 6 definitive receipt and delivery points on the NGT Project to be essential to the Project's objective, whereas we do not consider the 13 tee-tap sites to be essential."  Tee-taps were excluded by FERC and cannot be considered as essential to the Project.

21.     FERC's primary reason for disallowing the alternatives as explained in the FEIS is because of the potential for financial harm to Nexus due to possible delays in construction while ignoring the harm to stakeholders.  This potential financial harm was determined by FERC to outweigh the millions in dollars of harm to the City of Green, City of New Franklin and Summit County in lost potential tax revenues and the loss in property value to property owners and restricted uses. [9]

---

[9] Nexus in its RR 10 Alternatives Report filed on June 12, 2015 in the FERC docket stated: "Additionally, the estimated costs of the City of Green Alternative would be approximately $107 million, which is approximately $28 million more than the corresponding segment of the proposed NEXUS pipeline route."  This conflated estimate does not comport with industry standards which reflect that the mean cost per mile of a 36 inch pipeline is $1,768,710 per

22.      As set forth below, FERC's reasons for dismissing an alternative pipeline route are arbitrary and capricious.  The FEIS violates the due process rights of the property owners who relied upon the various land use plans in purchasing and building their residences and businesses.

## V.      The Final Environmental Impact Statement Ignores Safety Concerns and other critical topics.

23.      The FEIS issued by FERC ignores critical filings by stakeholders, lacks evidentiary support, is contrary to FERC's own findings, is arbitrary, biased, and capricious and should be overturned or vacated.[10]  For the following reasons, the FEIS must be overturned and vacated and the Application stayed pending further proceedings.

24.      The following statement presumably written by FERC staff is found in the FEIS:

> "The NGT project's proposed construction work area is within 50 feet of 178 residential structures (including homes, garages, and associated structures). NEXUS has developed site-specific residential construction plans for the residential structures within 50 feet of the construction work area.  **We reviewed these plans and find them acceptable.**  To further minimize effects on residences, we recommend that for the seven residences located within 10 feet of the construction work area, NEXUS provide evidence of landowner concurrence with the site-specific residential construction plans prior to construction." (emphasis added). Exhibit 1 at ES-10.

25.      The following statement presumably written by FERC staff is found in the FEIS:

---

mile. See https://drive.google.com/file/d/0B550ru3QDcfqWWV3bWJHcENabmM/view?usp=sharing   The proposed alternate route ("COGAR"), if adopted, would only add 5.5 additional miles due to co-location with Rover (about $10 million extra).  In any event, Nexus admits that the COGAR under worst case scenario would cost them only $28 million extra.  Neither Nexus nor FERC balances the losses to Summit County Ohio which are approximately $123 million in lost tax revenue, plus the losses to property owners ($150 per linear foot, plus the loss to the remainder or residue) and losses associated with business interruption and destructive impact to streets and infrastructure, etc.   Nowhere in the FEIS does FERC analyze these losses to the targeted communities and balance them again the alleged gains.  FERC only suggests the economic benefits that may be derived overall across the pipeline.  FERC also does not analyze whether products are purchased in the United States such as the pipeline steel or whether contractors and employees from other states and countries will be utilized and where those employee payroll taxes are paid.  During this case, it was discovered that Nexus did not pay Ohio Worker's Compensation despite engaging in dangerous survey activities on private property.

[10] See Exhibit 6 with tables reflecting critically important topics ignored by FERC in the FEIS.

"Sixty-two planned or ongoing residential and commercial/industrial development projects have been identified within .025 mile of the proposed NGT Project facilities.  We recommend that NEXUS continue discussions with developers and file updated correspondence with the Commission prior to construction for review and approval." Exhibit 1 at ES-11

Many of these planned development projects are located within the City of Green in Summit County, Ohio.  The location of the NGT Project will render these development projects unacceptable and unfeasible to property owners.

26.     The FEIS executive summary states:

"Numerous stakeholders commented that the pipeline should be routed in less populated areas further to the south to minimize the risk of a pipeline incident on the public.  DOT safety standards are intended to ensure adequate protection of the public, including more stringent design requirements in increasingly populated areas.  Pipelines must be designed, constructed, operated, and maintained in accordance with safety standards.  Further, the EIS demonstrates that the likelihood of an incident is very low at any given location, regardless of population density.  Instead, a relevant issue for consideration in the various alternative analyses is with respect to residential land use impacts, which is a factor considered in the EIS for the alternatives."
Exhibit 1 at ES-17.

27.     Despite FERC's conclusion that the "EIS demonstrates that the likelihood of an incident [accident] is very low at any given location, regardless of population density" (ES-17) FERC's regulated pipelines do routinely have accidents and incidents which have caused numerous deaths and millions of dollars in damages annually.  Statistical tables from the Pipeline Hazardous Materials and Safety Administration ("PHMSA") are attached and made a part hereof as Exhibit 7 .[11]

28.     Since 2010, there have been 4,215 pipeline incidents nationally resulting in 100 reported fatalities, 470 injuries, and property damage exceeding $3.4 billion. https://www.fractracker.org /2016/11/updated-pipeline-incidents/  One serious accident recently

---

[11]   Enbridge's safety record also reveals that accidents do routinely occur.   See Exhibit 8.

occurred in 2016 in Pennsylvania on a FERC regulated pipeline owned and operated by the

Nexus partner, Spectra Energy (now Enbridge), causing serious damage and injury. [12]

     29.     Experts within the field of natural gas distribution have studied the accidents

occurring on high pressure natural gas pipelines and recommend safety setbacks for pipelines

such as Nexus between approximately 1000 to 1500 feet (500 meters) radius.  These studies

repeatedly were filed on the FERC docket for the Projects but were ignored by FERC and not

even mentioned in the EIS or FEIS.  FERC simply defers to the "DOT safety standards."  Copies

of these studies are attached and made a part hereof as Exhibit 9 and 10. [13]

     30.     Federal agencies other than FERC recognize the necessity for safety setbacks.

PHMSA recognizes Potential Impact Radius Formulas by the Department of Transportation

(DOT) which were referenced in filings by stakeholders along with other materials, but FERC

refused to acknowledge these safety issues.[14]  These engineering studies, data and other

government regulations demonstrate that FERC safety standards do not comport with modern

scientific and engineering data which concludes that high pressure natural gas pipelines should

---

[12]  https://stateimpact.npr.org/pennsylvania/2016/08/04/spectra-expects-to-pay-100-million,"The Company operating an interstate gas transmission line that exploded last spring outside Pittsburgh expects to pay between $75 to $100 million to inspect and repair its pipeline system."  One man lost an arm and a leg in the accident and residences were destroyed.

[13] See Xelene Power Ltd. Natural Gas Pipeline Safety Setback By C. Rhodes, P. Eng PH.D, December, 2014, Exhibit 9, a copy of which is attached.  A Model for Sizing High Consequence Areas Associated with Natural Gas Pipelines, Topical Report Prepared by: Mark J. Stephens, October, 2000, Exhibit 10, a copy of which is attached; and Pipeline Emergency Response Guidelines, Pipeline Association for Public Awareness at Appendix C, 2015 Edition.

[14] See Exhibit 11, DOT PIR Report regarding calculations for Potential Impact Radius Formulas; filings regarding this DOT study was also filed with FERC: "The threat from a release of a gas product is not limited to ignition of the jet in the ditch and the subsequent thermal radiation. There are at least two other threats posed by rupture of a gas pipeline 1) a vapor flash fire which could potentially extend the threat zone outside of the Right-of-Way limits 2) Formation of a toxic gas cloud, which again may drift downwind, potentially extending the threat zone outside ROW limits . . . A key element of the Gas Integrity Management Rule (49 CFR 192, Subpart O) is the calculation of the potential impact radius (PIR) of a circle within which the potential failure of a pipeline could have significant impact on people or property.  The failure of a gas pipeline can lead to various outcomes, some of which can pose a significant threat to people and property in the immediate vicinity of the failure location.  Page 1."  See also Subpart C-Siting of HUD-assisted Projects Near Hazardous Operations Handling Conventional Fuels of Chemicals of an Explosive or Flammable Nature, 24 CFR§51.200 et seq.; https://primis.phmsa.dot.gov/com/pipa/pipa_consultation_planning.htm? No cache=9784.

not be constructed within close proximity to residential dwellings, parks, or commercial uses.
Rather, high pressure high volume pipelines are best suited in non-residential areas when
alternative routes exist.

31.     Rather than address the safety issues as required by law, FERC punts this issue to
another federal agency:

> "Pipeline safety in the proximity to residential, commercial, and industrial
> development is a primary concern raised by many stakeholders who commented
> in support of the City of Green Alternative.  DOT safety standards are intended to
> ensure adequate protection regardless of proximity to development.  The pipelines
> and aboveground facilities associated with the NGT and TEAL Projects must be
> designed, constructed, operated, and maintained in accordance with these safety
> standards.  **Therefore, we find either route is safe, regardless of population
> density** (see section 4.13)." (emphasis added).

Not only does FERC abdicate its responsibility to consider safety, there is no evidence that the
DOT was consulted on the route's safety aspects for this pipeline.  DOT is expressly prohibited
from recommending location or routing of the pipeline: "49 CFR  § 60104 (e) LOCATION AND
ROUTING OF FACILITIES.—This chapter does not authorize the Secretary of Transportation
to prescribe the location or routing of a pipeline facility."  Consequently, no government agency
looked or provided comment as to pipeline safety on this Project.  FERC took a "no look"
approach rather than a "hard look" required under NEPA.

32.     Section 4.13 of the FEIS simply repeats FERC's delegation of all safety concerns
to PHMSA, who does not review the siting of pipeline projects-- simply concluding that DOT
construction standards make all pipelines safe regardless of population density or proximity to
residences or other conditions that may exist.  The DOT standards fails to create safety setbacks
for residential uses and ignore regulations on land use, land planning and zoning standards for
industrial uses as required by NEPA.  In fact, DOT standards suggest that by making the pipeline

thicker makes it safer. However, no competent engineering data is supplied to support that conclusion. Essentially, DOT standards allow the equivalent of dynamite factories to be constructed within one foot of residences.

33. FERC has established no safety setbacks, allowing residential structures within one foot of the pipeline or to the edge of the permanent easement. Further, FERC is aware of the dangers posed by the current pipeline route as evidenced by the FEIS. An example of the elevated human impact of the current route is given by the following example using the data from Table 11.4-1: "Location of High Consequence Areas along the NEXUS Project Pipeline Facilities" in Nexus Resource Report 11:

| | |
|---|---|
| Distance through Summit Co: | 16.0 miles |
| Distance of HCAs in Summit Co: | 9.0 miles |
| Distance through State of Ohio: | 188.0 miles |
| Distance of HCAs in Ohio: | 31.7 miles |
| Density of HCAs in Ohio: | 16.9% |
| **Density of HCAs in Summit Co:** | **56.3%** |

34. FERC has placed convenience for the Applicant above safety considerations and land use planning and zoning codes. Nexus has simply chosen the shortest route from Kensington, Ohio to the Dawn Hub in Ontario, Canada. FERC's unsupported, conclusory determinations set forth in the FEIS abrogate its statutorily imposed obligations to consider safety in favor of accommodating Nexus at the expense of the public.

35. The findings set forth in the FEIS are arbitrary and capricious because a "no look" was provided by FERC rather than a "hard look." The NGA gives property owners no adequate means to protect themselves since they are forced to accept pipelines such as Nexus through

20

eminent domain once the Certificate is issued.  Said lack of safety setbacks and the imposition of

the resulting dangers upon property owners constitute both substantive and procedural due

process violations under the 5th Amendment of the U.S. Constitution.

## VI. The FEIS Impermissibly Delegates Safety Considerations to Another Federal Agency Lacking Authority to Site Pipelines.

36.     The FEIS <u>explicitly</u> delegates safety considerations for proposed natural gas

pipelines to another Federal Agency (PHMSA):

> "As discussed in section 4.13, the transportation of natural gas by pipeline
> involves some incremental risk to the public due to the potential for an accident;
> the DOT is the federal agency responsible for administering the national
> regulatory program to ensure the safe transportation of natural gas."

37.     Section 4.13.1 of the FEIS explains that:

> "PHMSA ensures that people and the environment are protected from the risk of
> pipeline incidents. . . Under a Memorandum of Understanding on Natural Gas
> Transportation Facilities (Memorandum) dated January 15, 1993, between DOT
> and FERC, DOT has the exclusive authority to promulgate federal safety
> standards used in the transportation of natural gas.  Section 157.14(a) (9) (vi) of
> FERC's regulations requires that an applicant certify that it would design, install,
> inspect, test, construct, operate, replace and maintain the facility for which a
> Certificate is requested in accordance with federal safety standards . . .  The DOT
> also defines area classifications, based on population density in the vicinity of
> pipeline facilities, and specifies more rigorous safety requirements for populated
> areas.  The class location unit is an area that extends 220 yards on either side of
> the centerline of any continuous 1-mile length of pipeline. . . . Pipe wall thickness
> and pipeline design pressures, hydrostatic test pressures, Maximum Allowable
> Operating Pressure (MAOP), inspection and testing of welds, and frequency of
> pipeline patrols and leak surveys must also conform to higher standards in more
> populated areas. . ."  Id 4-238-239.

> **"With regard to safety, we reiterate that DOT safety standards are intended
> to ensure adequate protection of the public regardless of where the pipeline is
> routed; therefore, there is no basis to adjust the corridor for safety reasons."**
> Id 3-42.  (Emphasis added)

This position by FERC violates the express criteria of the National Environmental Policy Act of

1969 (NEPA) and ignores the latest scientific and engineering data on the topic of safety

setbacks, including PHMSA regulations recognizing "potential impact radius" and urging setbacks for developers planning housing against existing pipelines.

38.     This Memorandum of Understanding by FERC constitutes an order or "rule making" within the meaning of the Administrative Procedures Act and was not specifically authorized by Congress.  FERC delegated the important safety functions required to be examined under NEPA to another agency, acted ultra vires, and failed to comply with the Administrative Procedures Act, 5 U.S. Code §553 (Rule making).  Pursuant to 42 U.S.C. § 7171 (g) Powers of Commission, FERC lacks the power or authority to delegate its duties under the NGA: "In carrying out any of its functions, the Commission shall have the powers authorized by the law under which such function is exercised to hold hearings, sign and issue subpoenas, administer oaths, examine witnesses, and receive evidence at any place in the United States it may designate."

39.     As a result of the DOT "Memorandum of Understanding," FERC has delegated all responsibility for safety issues to PHMSA and provides no safety setbacks for high consequence areas, potential impact radius, or "blast zones" and fails to incorporate safety setbacks into the pipeline siting process despite NEPA's requirement to consider safety and the human environment under the National Environmental Policy Act of 1969.  NEPA requires federal agencies to provide an EIS for all "major Federal actions significantly affecting the quality of the human environment." [15]

40.     Finally, by simply deferring to DOT pipeline guidelines, FERC has ensured that no safety analysis has been performed regarding this specific pipeline and its route.  A one-size-

---

[15] 42 U.S.C. § 4332(C); see also *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004).

fits-all approach such as used by FERC does not satisfy the requirements of NEPA, violates the APA and Constitutional due process.

41.     Due to FERC's failure to comply with the federal laws, it must be enjoined from issuing the Certificate.

**VII.    The FEIS Is Arbitrary and Capricious for failing to comply with NEPA.**

42.     "NEPA requires the federal government to identify and assess in advance the likely environmental impact of its proposed actions, including its authorization or permitting of private actions. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756-57, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004). NEPA's mandate, which incorporates notice and comment procedures, serves the twin purposes of ensuring that (1) agency decisions include informed and careful consideration of environmental impact, and (2) agencies inform the public of that impact and enable interested persons to participate in deciding what projects agencies should approve and under what terms. *Id*. at 768. The statute serves those purposes by requiring federal agencies to take a "hard look" at their proposed actions' environmental consequences in advance of deciding whether and how to proceed. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). The statute does not dictate particular decisional outcomes, but "merely prohibits uninformed--rather than unwise--agency action." *Id*. at 351; see also *Pub. Citizen*, 541 U.S. at 756-57. [16]

_____

[16] The implementing regulations under NEPA require analysis of the following areas:

"[40CFR] §1502.13 Purpose and need.  The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.
(§1502.14)  Alternatives including the proposed action.  This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§1502.15) and the Environmental Consequences (§1502.16), **it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decision maker and the public.** In this section agencies shall:
(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.
(c) Include reasonable alternatives not within the jurisdiction of the lead agency.
(d) Include the alternative of no action.
(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.
(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.
§1502.15 Affected environment.  The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration. The description shall be no longer than is necessary to understand the effects of the alternatives. Data and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.
§1502.16 Environmental consequences.  This section forms the scientific and analytic basis for the comparisons under §1502.14.  It  shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section 102(2)(C)(iii) as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in §1502.14. It shall include discussions of:
(a) Direct effects and their significance (§1508.8).
(b) Indirect effects and their significance (§1508.8).
(c) **Possible conflicts between the proposed action and the objectives of federal, regional, state, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned.** (See §1506.2(d).)
(d) The environmental effects of alternatives including the proposed action. The comparisons under §1502.14 will be based on this discussion.
(e) Energy requirements and conservation potential of various alternatives and mitigation measures.
(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.
(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.
(h) Means to mitigate adverse environmental impacts (if not fully covered under §1502.14(f))."  (emphasis added)


   In *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), the Supreme Court noted that " NEPA promotes its sweeping commitment to prevent or eliminate damage to the environment and biosphere by focusing Government and public attention on the environmental effects of proposed agency action" so that the " agency will not act on incomplete information, only to regret its decision after it is too late to correct." Id. at 371, 109 S.Ct. 1851 (internal quotation marks and citations omitted). In *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), the Supreme Court reiterated that " [p]art of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures." 129 S.Ct. at 376; see also *Monsanto v. Geertson Seed Farms*, __ U.S. __, 130 S.Ct. 2743, 2768, 177 L.Ed.2d 461 (2010) (Stevens, J., dissenting) (noting that an EIS  is especially important where the environmental threat is novel). Ultimately, our role" is to insure that the agency has taken a 'hard look' at environmental consequences...." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).   In accord with this approach, we have reiterated that the " agency bears the primary responsibility to ensure that it complies with NEPA." *'Ilio' ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1092 (9th Cir.2006) (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004)). *California Coaltion Wilderness v. U.S. Dept of Energy*, 631 F.3d 1072, 1097 (9th Cir. 2011).

43.    The FEIS document uses phrases such as "no long term effect, no significant effect or any significant impact" thirty four times without any substantive data, expert testimony or evidence in support.  Moreover, FERC's FEIS documents contain similar conclusory statements found in other pipeline cases.  It is clear that FERC is simply using a template and inserting names and some of the relevant information, but the conclusions in favor of the Applicant appear predetermined.  This behavior has led the Applicant to expect a certain outcome and begin purchasing easements long before the FEIS or Certificate is issued.  Far from the "rigorous" analysis required, it is clear that FERC is doing superficial or no analysis whatsoever.  It is providing a "no look" instead of a "hard look" and is rubber stamping the application in nearly every case including this one.

44.    One example is found in DEIS Executive Summary Section on Groundwater, Surface Water, Water Use, and Wetlands, which is later incorporated into the Executive Summary of the FEIS:

> "The NGT Project would cross 16 Wellhead Protection Areas (WHPA) at 26 locations. . . . A total of 25 wells and 6 springs were identified within 150 feet of the Projects.  Additionally, the NGT Project would cross 16 wellhead protection areas; . . . The Projects would cross a total of 478 waterbodies . . .  The applicants would sue the HDD method to cross 30 waterbodies at 16 HDD locations, including all Section 10 navigable, National River Inventory-designated, and Ohio Environmental Protection Agency (Ohio EPA) –designated outstanding superior water quality streams. . .  The applicants would use the conventional bore method to cross 69 waterbodies.  The remaining waterbodies would be crossed using dry . . . and open-cut wet crossing methods. . .  The Projects would cross 12 water protection and 5 waterbodies that have public water intakes within 3 miles downstream . . . **Based on our review, we believe that, No long-term effects on surface waters would result from construction and operation of the Project. No designated water uses would be permanently affected**."

Nowhere does FERC define what constitutes a "significant impact" and clearly the impacts on these water bodies are "significant."

45.     The FEIS continues: "Nexus . . . met with city [of Green] officials on nine
separate occasions over a 1-year period to discuss their specific issues and concerns.  As a result
of the meetings between NEXUS and stakeholders, about 84 percent of the proposed route
within the city limits was adjusted via minor route variations since NEXUS entered the pre-filing
process. . . ."Id 3-23.   There is no evidence that Nexus ever met with Green officials nine times.
This statement is simply false and has no basis for being mentioned in the FEIS.  Its only effect
is to supply a false narrative of the events.  Only one meeting took place between Nexus and the
Coalition to Reroute Nexus (CoRN, a stakeholder nonprofit group) and that was a presentation
by Joan Wachholder from FERC before the Application was filed and during this meeting no
specific discussions regarding rerouting occurred.  During that meeting it was determined that
Nexus chose the original route using satellite data from desk top computers in offices in
Houston, Texas.

## VIII.  FERC's Decision not to utilize an Alternate Route Suggested by the City of Green Is Arbitrary and Unsupported by the Facts.

46.     The City of Green commissioned the Cleveland State University for an economic
analysis which was filed on the FERC docket, a copy of which is attached as Exhibit 12.  The
report concludes that the Nexus pipeline will cause damages due to a loss of tax revenues to local
governments in the amount of 122.8 million dollars (includes pipeline tax revenue of $17.7
million).  It also pointed to loss in property values and loss of commercial areas especially
around the Akron Canton regional airport.  The analysis suggested an alternate route to minimize
these adverse effects.

47.     FERC attacked the CSU report attempting to discredit it for an entire page of the

FEIS. [17]   In its attempt to discredit the report, FERC states:

> "Finally, the economic analysis seems to suggest that the proposed route would
> leave the City of Green disproportionately suffer the effects of the Projects
> because the city is more affluent than other areas of the state.  The report cites
> higher home values, higher employment rates, more buying power, and faster
> growth than other parts of the state.  Conversely, relocating the route from more
> affluent areas to those that are less affluent presents an entirely different set of
> impacts, including the possibility of an unfair distribution of environmental
> burdens on less affluent communities (see section 4.10.10).  On the whole, we did
> not find the economic analysis compelling." Id 3-39.

48.     Two pages later FERC attempted to support its novel legal theory of economic

injustice by suggesting that the NGT Project would be an unfair burden on the Amish

community, a community through which FERC approved the E.T. Rover Pipeline, while the City

of Green which was allegedly "more affluent" should carry the burden of constructing Nexus.

> "The environmental impacts of the City of Green Route Alternative on Amish
> residents would be nearly identical to the impacts experienced by other farmers
> (see section 4.9).  The main exception would be public safety in areas where
> Amish horse-and-buggy traffic would use the same roads as heavy construction.
> These roads may be rural and narrow, and present additional risks to road users.
> Normal speeds for horse-drawn buggies are between 5 and 8 miles per hour, and
> horse-drawn vehicles may be even slower when pulling large farm equipment or
> when crossing intersections (ODOT, 2016).  Conflicts with faster moving
> construction-related traffic could occur."  Id 3-41.

49.     FERC believes that rerouting to the City of Green Alternate Route ("COGAR")

was an "unfair distribution of environmental burdens on less affluent communities" such as the

Amish who voluntarily use horse-drawn buggies.  No economic analysis is made defining

affluent and no economic analysis is offered to contrast the "affluence" of the City of Green

versus the area where Amish reside.  While the Amish do not use motor vehicles, unless taxied

by "English" or if Mennonite, only government officials in Washington D.C. could conclude that

---

[17] As the facts of this case are developed through discovery, Plaintiffs will demonstrate that this is a normal practice
for FERC. FERC routinely attacks unfavorable export reports or simply ignores them while conflating industry
reports or studies supplied by the Applicant.  This is one of several examples of institutional bias.

the Amish are less "affluent" solely because of their religious customs, preferred mode of transportation, or modest handmade wearing apparel.

50.     Moreover, FERC failed to mention this argument when recently approving the E.T. Rover pipeline, which traverses the Amish community and is currently under construction. The COGAR simply followed the E.T. Rover pipeline route for a number of miles heading in a Westerly direction beyond the Amish community consistent with Federal Energy policy to co-locate the pipelines. Section 368 of the Energy Policy Act of 2005 (EPAct) recommends identifying corridors on federal lands; E.T. Rover, once FERC approved the certificate, became federal land under the jurisdiction and supervision of FERC.  FERC was required to consider placing these two pipelines together consistent with the Projects' objectives.

51.     Further, the FEIS dismissed the fact that COGAR would greatly reduce the number of residences within the blast zone or impact radius of a pipeline failure:

> "The Optimized City of Green Route Alternative has 17 dwellings within 150 feet of the pipe centerline, whereas the proposed route has 66 dwellings, a reduction of 49 dwellings.  This difference appears substantial based on magnitude alone; however, intensity must also be considered.  One way to measure intensity is to determine if the impact is concentrated in a small areas, or if it is diluted over a large expanse.  In this case, the 49 additional dwellings are dispersed over a 97.5 mile span, which equates to an average of about 1 additional dwelling every 2 miles.  While 49 additional dwellings over a 1 or 2 mile span may be intense, 1 additional dwelling over a 2 mile span is not intense.  **Thus, we find that affecting 49 additional dwellings over 97.5 miles is not significant.**"  Id 3-44.

In order to justify ignoring a nearly 75% reduction of homes in the impact or blast radius, FERC creates a new factor called "intensity" without any basis, legal precedent and or logic. When factors such as "intensity" are created for the sole purpose of discrediting a viable route alternative, it is clear that such alternative was not seriously considered and is reflective of arbitrary and capricious conclusions.

52.     An analysis of the City of Green Alternate Route at Table 3.3.3-1 reflects that the COGAR significantly reduced greenfield construction which was refined at Table 3.3.3-3.  In the fine print FERC acknowledges that if Rover is constructed first (which has been approved and is under construction) Greenfield construction would be reduced from 78.9 to 58 miles compared to the Nexus preferred proposed route of 62.7 miles.  Forest land crossings would be similarly reduced. See "a" in table.  Essentially the COGAR places the route along-side Rover for a number of miles consistent with Federal Department of Energy corridor policy to reduce conflicts.  Wetland crossings are reduced by 12 acres.  Conflicts with state and local parks are nearly eliminated and conflicts with residential structures are reduced by half.

53.     The FEIS's rejection of the City of Green Alternate Route is arbitrary, capricious, and objectively deficient.  As such, this Court may, and should, enjoin the FERC process, issuance, or effectiveness of the Certificate, and vacate the FEIS until a proper FEIS is issued.

**IX. The FEIS Fails To Analyze the Environmental Impacts of the Proposed Pipeline Route.**

54.     A considerable controversy exists in this case over Nexus crossing many feeder streams and impacting the hydrology of the Singer Lake Preserve or Bog.  Many filings were made on this topic. FERC only devoted one small paragraph to the topic in its FEIS.

55.     The NGT Project will be within 450 feet of the Singer Lake Preserve or Bog, a unique environmental site with rare endangered species.  FERC concludes:

 "Implementation of special construction techniques described in NEXUS' E7SCP, such as installation of trench plugs, and restoration of wetland soils, vegetation, and contours following the completion of construction, would minimize impacts on wetlands that may be associated with Singer Lake Bog. Based on the construction and mitigation measures described previously, and our review of the issues raised by the City of Green, we do not anticipate that wetland hydrology and existing flows would be adversely impacted by construction of the NGT Project."  Id 4-66.

29

Note that this "conclusion" is based upon "anticipation" rather than a "hard look" hydrology

study which should have been conducted.

56.     All of the scientific data supplied by the Cleveland Museum of Natural History

and the City of Green on the FERC docket suggests that a different conclusion exists—a

conclusion based upon rigorous science rather than "anticipation."  Copies of their submissions

are attached as Exhibit 13.

> "It is apparent that Nexus is considering a localized reroute [not part of the
> original route] that could impact the Bog.  This area is too sensitive and too
> valuable of a natural resource to bear the burden of any disturbance for the sake of
> a pipeline. . . . The original study area for the Nexus pipeline would also
> potentially impact several wetlands in close proximity to Singer Lake bog.  These
> wetlands possibly have hydrologic connections to Singer Lake Bog."

57.     Chrissy Lingenfelter, City of Green, April 24, 2015, writes:

> "Singer Lake Bog is considered one of the most important glacial bogs in Ohio
> by the Ohio Division of Natural Areas and Preserves and the Lake Erie Allegheny
> Partnership. . . A total of 352 acres have been protected within the museum's
> Singer Lake Bog Preserve . . . co-ownership with the City of Green on 33 acres
> and a conservation easement on 24 acres. . . Singer Lake Bog is technically a poor
> fen . . . threatened in the U.S. Singer Lake Bog supports 70 species of dragonflies,
> the highest number known within any wetland in Ohio and three of those
> dragonflies are listed as endangered in Ohio."

58.     On May 5, 2015 Cleveland Museum of Natural History submitted a report.  The

Museum's report sets forth an extensive list of rare and endangered species located in the Bog.  It

is unclear whether the hydrology will be ruined by trenches cut seven feet into the earth along

the entire length of the Bog system.   These cut trenches will be just a few hundred feet away

from the Bog and will cross its feeder streams and wetlands.  If Singer Lake is ruined by runoff,

sediments, a spill such as the one that recently occurred in construction of the E.T. Rover

pipeline, or ground water interruption, the entire Bog system may be destroyed permanently.

Neither FERC nor Nexus will be responsible for such destruction should it occur and cannot

repair it once it is destroyed.  The bog will be gone forever and will cause irreparable injury to the community and natural environment.

59.     FERC also exhibits callous disregard for old growth forests:

"We received several comments expressing concern about the loss of mature trees and potential 'old growth' forests.  Old-growth forest is a subjective term describing forests that are relatively old and undisturbed by humans . . .  Based on our review of recent and past aerial photographs, we observed isolated mature forested areas and older trees, but did not identify large contiguous old-growth forests; therefore, we have determined that constructing and operating the NGT Project would not impact old-growth forest."

In fact "old growth" is well defined within federal law, which means trees older than 100 years and it is not a subjective term.[18]  Further, aerial photographs are a poor manner to observe the age of trees.  A "hard look" would have revealed the presence of old growth forests which require more examination on potential impact than afforded in the FEIS.

60.     Ariss Park, located within the City of Green, which is targeted to be destroyed by Nexus via clear cutting and ditch trenches, has approximately 12-15 acres of old-growth forest, with some of the oldest trees in Ohio aged at 250 years, as well as many unique flora and fauna found in the park.  A biologist from Akron University filed detailed reports on this topic and these were completely ignored by FERC-- not mentioned once.  Rather than reading the reports of experts who were employed at great expense, FERC reviewed aerial photographs and "did not identify large contiguous old-growth forests."  It is clear from the record that FERC did not read most of the significant filings by municipalities, stakeholders and experts contained on the FERC docket.  FERC's findings are not supported in the FEIS and are arbitrary and capricious and

---

[18] *Miller v. United States*, 620 F.2d 812, 817 (Fed. Cir. 1980) ("Timber more than 100 years old is classified as old-growth timber.")  Several reports were submitted by a biologist, Chris Chaney, from the University of Akron on the forests, flora and fauna, none of which are acknowledged by FERC and were apparently not read.

notably biased in favor of the Applicant if not hostile to the communities in the Northern District of Ohio.

**X.  The FEIS Does Not Properly Analyze the Class 1 Dams Impacted by the Pipeline.**

61.     Another controversy exists, for which dozens of submissions were made involving two Class 1 dams[19], Comet Lake and Nimisila Reservoir, located within the City of Green.

62.     The NGT Project will be constructed within 500 feet of Comet Lake dam and 830 feet of Nimisila Reservoir dam.

63.     Nexus crosses the entrance to Comet Lane located in Green, which dead ends against the Nimisila Reservoir and has several residential properties located on it which are owned by elderly residents.  Concern was raised by residents, based upon weakened dam structures throughout Portage Lakes (currently the dam on Eastern Reservoir is slated to be completely rebuilt by ODNR during 2017, a major undertaking), that the vibration alone from the pipeline could weaken the dam structures, rupture the dams, and cause flooding downstream across Main Street and into New Franklin, where numerous homes exist.

64.     The FEIS fails to address these concerns; no information or analysis is provided.

65.     The COGAR route would eliminate the risks associated with the Class 1 dams. However, FERC fails to acknowledge that by adopting the COGAR, all of the conflicts would be abated and Nexus would suffer only a slight delay.

**XI. The FEIS Reached Arbitrary and Unsupported Conclusions on the Effect of the Pipeline on Property Values.**

---

[19] "[(1) Dams having a total storage volume greater than five thousand acre-feet or a height of greater than sixty feet shall be placed in class I. A dam shall be placed in class I when sudden failure of the dam would result in one of the following conditions. (a) Probable loss of human life. (b) Structural collapse of at least one residence or one commercial or industrial business." Ohio Administrative Code 1501:21-13-01)].

66.     The FEIS disregarded scholarly study on the effect of the pipeline on property

values in favor of canned language and unsupported logic: "As for comments on property values

and future development, we refer the reader to section 4.10.8 of the EIS where we find no

conclusive evidence indicating that natural gas pipeline easements would have a negative impact

on property values." Id 3-40.   This line of reasoning is used by FERC in nearly every pipeline

case (See page 4-192 of the FEIS).  Other experts have commented in other cases about

economic impacts but FERC refuses to acknowledge scholarly study on the topic of land value

and economic impacts.  See Keylogeconomics.com.

67.     FERC consistently argues that pipelines have no impact on property values and

the same standard paragraphs are used repeatedly in FERC EIS documents.  None of the studies

cited by FERC examine the number or purchasers turned away by knowledge of the existence of

a pipeline and failed to make offers or purchases on property located near pipelines. Examples of

this situation occurred with certain Plaintiffs in this case, whereby purchasers walked away upon

learning of the pipeline.  According to Medina County Auditor Michael Kovack, the official

responsible for determining property values for tax purposes, in a letter dated May 13, 2015 filed

on the FERC docket: "I have been made aware of some information from Nexus that the pipeline

will have no impact on property values. . . I disagree."  He further opined that the reduction in

value could be substantial depending on the path and its effect on individual properties.

68.     Property value is impacted by pipelines and the decrease in value is measured as

part of the eminent domain process-- if there was no decrease in value, would there ever be any

compensation owed in appropriation or eminent domain proceedings?  Pipelines not only reduce

the residue of property[20], but negatively impact communities for many reasons including interference with land use plans (See Exhibit 12, CSU study), which impacts the use, enjoyment and taxable rate of the affected areas and interferes with business operations.  See keylogeconomics.com.

69.     The Cleveland State University study filed on the FERC docket confirms that impacts to land use plans also reduce future tax revenue streams in urban areas.  FERC chooses to only acknowledge studies favorable to the industry's perspective, citing temporary jobs and utility taxes, and few independent studies have been conducted.  (CSU's  and Spencer Phillips, PH.D, at KeyLogEconomics.com appear to be the only studies conducted.)

70.     FERC attempted to discredit the CSU study:

"We did not find the study particularly compelling for the reasons stated in section 3.3.3.  Also, as discussed in section 4.10.8, we find no conclusive evidence indicating that natural gas pipeline easements would have a negative impact on property values. Additionally, the counties and cities where Project facilities are located will receive positive economic impacts in the form of direct, indirect, and induced spending during construction of the NGT Project."  Id 4-193.

FERC concludes: "Based on the research we have reviewed, we find no conclusive evidence indicating that natural gas pipeline easements would have a negative impact on property values."  Id 4-193.  This statement not only ignores federal law, but actual studies filed on the docket and required to be considered.

71.     However, FERC provides no evidence to support that conclusion (other than pro forma, general projections such as one performed by Ohio State University hired by Nexus) and fails to consider the negative impacts by interference with local businesses and residences, noise, pollution, and destruction to roads, infrastructure and loss of use.  The CSU study specifically brought out the negative impacts to municipalities versus townships.

---

[20] *Rockies Express Pipeline LLC*, 734 F3d 424 (6th Cir. 2013).

72.     FERC further argues that "Nexus estimates that over $449.6 million would be spent . . . would have temporary surface impacts on roads . . . increase property taxes." However, FERC filings by local taxing authorities reveal that few taxes would be collected and that Nexus has not been paying transfer fees on easements.[21]  Further, Nexus does not pay for impacts to roads thereby requiring local taxpayers to pay for negative impacts to infrastructure. Only ad valorem taxes on equipment would be collected by county assessors subject to Ohio law. See 57 O.R.C. § 5713.01 *et seq.*

73.     The FEIS is filled with unsubstantiated conclusions of fact or law based upon un-examined assertions by Nexus, repeated by FERC, while ignoring most other submissions from stakeholders.  The entire FERC process is an elaborate charade.  On FERC's call center line, FERC employees brag that FERC has never denied a pipeline application.[22]

## XII.  The NEXUS Pipeline Is an Export Pipeline.

74.     No contested pipeline in FERC history has been approved with less than 90 percent subscription rates.  Only 59% of Nexus is subscribed.  Most of the capacity on the NGT Project is subscribed to affiliates.

75.     The NGT Project is considered an export pipeline.  The majority of the natural gas it transports is destined for the Dawn Hub in Canada or export markets, approximately 86 percent of the subscribed capacity.

---

[21] Nexus was recently discovered not paying the transfer fees on easements as required by O.R.C. §§ 319.202 and 319.54.  The conveyance fee in Medina is $3 per $1,000 in value and in Summit is $4 per $1,000 in value.  Easements less than $1,000 are exempt.  On January 19, 2017 the Summit Fiscal Office sent out an email warning all counties of this issue.  An investigation ensued and Nexus began paying the missing conveyance fees in some cases.  In light of these developments, and other issues that have come to pass, it is difficult for the Plaintiffs and others to give much credence to Nexus projections of tax benefits of this Project.

[22] But see *Jordan Cove Energy Project* 154 FERC ¶ 61,190 (the only pipeline case denied in recent times).

76.     Nexus does not have, nor has it applied for, an export permit or Presidential permit under Section 3 of the Natural Gas Act, 15 U.S.C § 717b, which does not allow for the issuance of a Certificate and accompanying eminent domain powers.  Nonetheless FERC is poised to approve the Project allowing NEXUS to exercise immediate eminent domain.

77.     Nexus is a Delaware Limited Liability Company with two partners, DTE Energy out of Michigan and Spectra Energy out of Texas.  However, Spectra was acquired by Enbridge of Canada in 2016 and the merger was completed on February 27, 2017.  Enbridge is now the lead developing partner on the Nexus Project and is filing documents on the FERC docket.

**XIII.   Jurisdiction, Venue, and Ripeness.**

78.     This is a civil action brought before this District Court pursuant to 28 U.S.C § 1331 and 15 U.S.C. § 717u seeking injunctive relief, declaratory judgment, and attorney fees against Defendant for committing acts, under color of law, with the intent and for the purpose of depriving Plaintiff of rights secured under the Constitution (5th Amendment) and laws of the United States; ignoring statutorily mandated duties and obligations under the Natural Gas Act, NEPA, the Administrative Procedures Act, and impermissibly delegating certain duties and obligations assigned to them under the Natural Gas Act.[23]

79.     This case arises under the United States Constitution and 15 U.S.C. § 717u of the Natural Gas Act.  This Court has jurisdiction in this matter pursuant to 28 U.S.C. Sections 1331 and 1343(a) (1) and (3). The declaratory and injunctive relief sought is authorized by 28 U.S.C. Sections 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

80.     This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. 1391 (b) (1), (2), (e) and 15 U.S.C. § 717u.

---

[23] See *Great Lakes Gas Transmission v. Essar Steal Minnesota LLC*., 834 F.3d 325 (8th Cir. 2016).

81.     The issuance of the FEIS is a final administrative action pursuant to Section 704 of the Administrative Procedures Act because it is designated as "final" and because pursuant to FERC's procedures, the only remaining step in the process is the issuance of the Certificate, which affords the Applicant the right of eminent domain against the Plaintiffs in this action.  The FEIS is not tentative or interlocutory but constitutes a consummation of FERC's decision making.  The FEIS determines rights and obligations of stakeholders and creates legal consequences for which the rights of the Plaintiffs will be impacted or deprived permanently. Extensive pleadings and comments (over 10,000) were filed in the FERC action and the period of public comment has expired; only the Certificate remains leaving Plaintiff's with no redress of the issues previously raised in this case or not addressed by FERC.  Once the Certificate is issued, Plaintiffs only method to address the issues asserted in this case is through the rehearing process and appeal as set forth in 15 U.S.C. § 717r.  Due to the standard procedures employed by FERC, the rehearing and appeal process is illusory and is unable to prevent injury to the Plaintiffs.  The agency action is ripe for judicial review and must be heard before the certificate is issued.  Moreover, this court has primary jurisdiction over federal issues raised under the U.S. Constitution, the Natural Gas Act or the Administrative Procedures Act.

**XIV.   Plaintiffs and Standing.**

82.     The Plaintiffs in this case are property owners or other entities as designated who are stakeholders of the Nexus Project.  The property owners are of two types: ones that are targeted by the Nexus Project and will be subject to eminent domain and ones that are contiguous to the Project within the 1,200 to 1,500 foot "blast or impact radius" of the centerline of the pipeline and may experience physical harm or property damage.

83.     The Plaintiffs have standing to bring this action because their rights are being impacted either due to ownership of real property because of the immediate threat of eminent domain once the Nexus certificate is issued or due to threat of physical injury because their residences are in close proximity of the Project and although not being compensated for any takings nonetheless their lives are at risk of injury, bodily harm or death.

84.     Additionally, Plaintiffs stand to lose protected interests due to FERC's violation of the land use plans upon which Plaintiffs relied when purchasing residential property.

**XV.     Causes of Action.**

**A.     Under the 5th Amendment to the United States Constitution- Procedural Due Process and Substantive Due Process Violations against the Federal Energy Regulatory Commission.**

85.     This Court should determine and declare the following acts and procedures do violate Plaintiffs procedural and substantive due process rights under the 5th Amendment.  The export of a commodity by a foreign-owned entity is not a public use for purposes of the 5th Amendment and is beyond the scope of the Natural Gas Act and FERC jurisdiction in cases involving eminent domain.

86.     Once FERC issues a Certificate, NEXUS will have eminent domain authority by virtue of the NGA § 717f(e).  Property will be destroyed and Plaintiffs' lives will unnecessarily be placed in danger.  The pipeline will be constructed and the arbitrary and capricious conclusions in the FEIS will be followed.

87.     The Property Owners have no other available remedy.  Once a Certificate is issued, eminent domain authority is automatically conferred upon NEXUS.  The Property Owner's only action at that point is to contest the value of the taken property.

88.     Although the NGA contains an appeal procedure to rehear the certificate, Courts have interpreted this procedure in a way that limits its applicability, exclusive of the damage issues in eminent domain proceedings.  The Property Owners must apply for a rehearing before FERC before they may appeal to the Circuit Court.  It has been FERC's consistent practice for a long period of time to grant the application for rehearing, but toll the actual rehearing decision, until after construction of the pipeline is completed and the takings under eminent domain have occurred.  At that point in time, the Taking Clause claims of the Property Owners are mooted and the underlying federal issues being raised in this case would evade judicial review before the Certificate is issued.[24]

89.     The Property Owners are afforded no other avenue to the Court to contest the Taking of their property or the abuses and deprivation of rights experienced.  There are no procedural protections in place.  The rehearing and appeal process set forth in 15 U.S.C. § 717r offers only the illusion of due process.  Plaintiffs' request for rehearing will be granted but the rehearing itself will be tolled until some indeterminate future date, as per FERC's standard practices.  While Plaintiffs await their rehearing, the pipeline will be constructed and gas will begin flowing—thereby consummating injury to the Plaintiffs and implementing the arbitrary and capricious finding in the FEIS.

90.     Alternatively, FERC's delegation of all safety issues to PHMSA constituted "rule-making" and was not authorized by Congress and failed to comply with the Administrative Procedures Act.

_____

[24] Several courts, having been presented with this situation, have noted that the aggrieved party could seek mandamus in the federal appellate courts to aid the appellate court's jurisdiction to review the underlying issues filed in the Motion for Rehearing but tolled indefinitely by FERC. *Dedham v. FERC*, Dist. Ct. D. Mass (15-12352) (2015).  However, aiding review of the motion for rehearing in the appellate court does not stay the eminent domain cases under the takings clause of the 5th Amendment or address issues related to the taking.

91.     FERC's refusal to consider safety as required under NEPA in the siting of the Nexus Project, placing the pipeline within close proximity and within recognized high consequence areas, impact radius, and blast zones unduly places property owners at unnecessary risk of damage to property, bodily injury or harm, and death, acknowledgement by FERC of the existence of equally suitable alternate routes for the Project.  Substantive due process rights of Property owners, living or working within 1,200 to 1,500 feet of the centerline of the pipeline, are being violated upon issuance of the certificate.

92.     Alternatively, FERC's procedures are inconsistent, contrary to existing laws, fail to provide adequate procedures, fail to inform property owners of important rights, impose burdens akin to forced labor in favor of the Applicant (mowing easements under threats of defoliant) and accordingly violate due process as afforded under the 5th Amendment.

**B.      Request for Preliminary and Permanent Injunction against FERC.**

93.     Plaintiffs hereby reincorporate the preceding paragraphs as if fully rewritten herein.

94.     Nexus seeks a Certificate from FERC granting it, inter alia, the authority to acquire via eminent domain portions of the Residential Property from the Property Owners.

95.     Such acquisition violates the Takings Clause of the 5th Amendment to the United States Constitution.  The Fifth Amendment to the Constitution of the United States of America does not permit private property to be taken via eminent domain unless it is taken for a public use.  The export of a commodity by a foreign-owned entity is not a public use.  The use of eminent domain on these facts is a clear violation of the Constitution.  Plaintiffs' chance of success on the merits is high.  FERC has failed to identify any public use in its FEIS and discuss how the Nexus Project complies with either the NGA or the 5th Amendment.

40

96.     The use of eminent domain in this case is also a clear violation of section 706 of the Administrative Procedures Act which prohibits "agency action, findings, and conclusions found to be--. . . (B) contrary to constitutional right, power, privilege, or immunity."

100.     The Court may not need to determine the Constitutional violation because the legislative history to the NGA suggests that eminent domain is not authorized for export pipelines, especially since no export permit has been applied for.  See *Distrigas Corp. v. Federal Power Comm.*, 495 F.2d 1057 (D.C. Cir. 1974).  The Natural Gas Act does not include gas exports to be within the definition of "interstate commerce."  Because FERC's Section 7 authority, which includes eminent domain authority, applies only to gas companies engaged in interstate commerce, ones engaged in export cannot utilize eminent domain so that issuance of a certificate conveying such authority would be illegal.

101.     Should Plaintiff's property be taken, they will suffer irreparable harm.  Once the property is taken, Nexus will install a 36" diameter pipeline on the taken property.  Trees will be cut, surface features removed, and heavy machinery will traverse Plaintiffs' property causing additional damage.  The use of the property will be forever limited.  Once made, some of these alterations and defacements will be permanent.

102.     Should a preliminary injunction issue, the damage to Nexus will be slight.  Nexus will have the ability to install the pipeline should it prevail.  The timeline for completion is merely delayed until this Court is able to issue a ruling on the FEIS, export violation, and Takings Clause issue.  Moreover, Nexus has already been delayed due to a lack of quorum and FERC and missing critical deadlines for tree cuttings.  Plaintiffs' injury for non-issuance of a preliminary injunction is substantially more severe than any injury to Nexus, due to the permanency of the loss of use and takings, should a preliminary injunction issue.

41

103.     Finally, a preliminary injunction under Federal Rule of Civil Procedure 65 would serve the public good.  This is clear from the very nature of Nexus' unconstitutional eminent domain usage.  Nexus' taking is unconstitutional because it does not constitute a public use.  The public benefits from not having their property taken to export a commodity to enrich a foreign entity.

**C.     Injunctive Relief against FERC for violations of the Natural Gas Act (15 U.S.C. § 717u) -  Exports Violations.**

104.     Plaintiffs hereby reincorporate the preceding paragraphs as if fully rewritten herein.

105.     Nexus seeks a Certificate from FERC pursuant to 15 U.S.C. § 717f to construct a pipeline which will be used primarily to export natural gas.

106.     However, 15 U.S.C. § 717b contains the procedure to be utilized when seeking to export natural gas.  A Certificate may only be issued under Section 717f where the pipeline is being constructed for the primary purpose of transporting natural gas in interstate commerce.

107.     Nexus seeks a Certificate under Section 717f so that it may utilize the eminent domain authority afforded by this section.

108.     By allowing Nexus to proceed under Section 717f, FERC has violated the statutory provisions and framework of the NGA.  Specifically, the NGA was designed to give sweeping eminent domain authority only where the pipeline would serve the public good.  Congress, by setting up a separate procedure for export pipeline, has conclusively established that export pipelines do not serve the public good.

109.     FERC is bypassing the statutory limitations placed upon it in violation of 5 U.S.C. § 706(2)(C).

110.    If Nexus is not enjoined from obtaining a Certificate, the Property Owners will suffer irreparable harm.  Once the property is taken, NEXUS will install a 36" diameter pipeline on the taken property.  Trees will be cut, surface features removed, and heavy machinery will traverse Plaintiffs' property, and the uses will be altered, causing additional damage.  Once made, some of these alterations and defacements will be permanent.

111.    Should a preliminary injunction issue, the damage to Nexus will be slight.  Nexus will have the ability to install the pipeline should it prevail.  The timeline for completion is merely delayed until this Court is able to issue a ruling on the FEIS, export violations issue and Takings Clause issue.  Plaintiffs' injury for non-issuance of a preliminary injunction is substantially more severe that any injury to Nexus should a preliminary injunction issue.

112.    Should a preliminary injunction issue, the damage to FERC will be negligible. Should FERC prevail it will simply resume the proceedings where they left off.  The delay does not impact FERC whatsoever.

113.    Finally, a preliminary injunction on this Count would serve the public good. Congress granted FERC the authority to issue a Certificate of Public Convenience under certain circumstances.  Congress specifically did not grant FERC the authority to issue such a Certificate for the exportation of natural gas.  Congress, consistent with the Fifth Amendment to the United States Constitution, only authorized the issuance of a Certificate and its attendant eminent domain authority in cases where natural gas was being transported in interstate commerce where it could benefit the public at large.

114.    This Court must issue a preliminary injunction to FERC and Nexus preventing the issuance of a Certificate and declare and determine that NEXUS may not seek a Certificate under 15 U.S.C. § 717f.

43

**D.**     **Declaratory Judgment against FERC.**

115.     Plaintiffs hereby reincorporate the preceding paragraphs as if fully rewritten herein.

116.     NEXUS seeks a Certificate from FERC granting it, inter alia, the authority to acquire via eminent domain portions of the Residential Property from the Property Owners.

117.     The issuance of a Certificate is imminent. Once a Certificate is issued, eminent domain authority is automatically conferred upon NEXUS.  The Property Owner's only action at that point is to contest the value of the taken property.

118.     Such acquisition violates the Takings Clause of the 5th Amendment to the United States Constitution and 5 U.S.C. § 706(2)(B).  The Fifth Amendment to the Constitution of the United States of America does not permit private property to be taken via eminent domain unless it is taken for a public use.  The export of a commodity by a foreign-owned entity is not a public use.  The use of eminent domain on these facts is a clear violation of the Constitution.

119.     The use of eminent domain is also a violation of section 706 of the Administrative Procedures Act which prohibits "agency action, findings, and conclusions found to be--. . . (B) contrary to constitutional right, power, privilege, or immunity."

120.     The Court may not need to determine the Constitutional violation because the legislative history to the NGA suggests that imminent domain is not authorized for export pipelines, especially since no export permit has been applied for.  See Distrigas Corp., 495 F.2d 1057 (D.C. Cir. 1974)   The Natural Gas Act does not include gas exports to be within the definition of "interstate commerce."  Because FERC's Section 7 authority, which includes eminent domain authority, applies only to gas pipelines engaged in interstate commerce, ones engaged in export cannot utilize eminent domain.

121.    Should Plaintiff's property be taken, they will suffer irreparable harm.  Once the property is taken, NEXUS will install a 36" diameter pipeline on the taken property.  Trees will be cut, surface features removed, uses will be altered, and heavy machinery will traverse Plaintiffs' property causing additional damage.  Once made, some of these alterations and defacements will be permanent.

122.    The Property Owners ask this Court to declare that the threat of or immediate exercise of eminent domain in this case violates the Fifth Amendment to the United States Constitution or in the alternative violates the Natural Gas Act.

**E. Substantive Due process violation and 5 U.S.C. § 706(2)(B) - reliance on land use restrictions.**

123.    Plaintiffs hereby reincorporate the preceding paragraphs as if fully rewritten herein.

124.    The residents of the City of Green, New Franklin and New Guilford have a protected property interest in the City's zoning plans and the property constructed and occupied in reliance upon those plans.

125.    The residents of the City of Green, New Franklin and New Guilford have expended funds and resources in detrimental reliance upon these zoning plans.  The City's residents established households and raise families in reliance upon the safety provided to them by the zoning ordinances and regulations.

126.    FERC's arbitrary and capricious reasoning and actions, set forth in detail above, deprive the residents of the City of Green, New Franklin and New Guilford of the safety and security they currently have.

127.    By opting against an alternate route, FERC is forcing many more residents of Green, New Franklin and New Guilford to live within the blast radius of a natural gas pipeline.

These residents built and bought their homes premised upon the belief that they were not in danger of an industrial accident, let alone having the potential source of such accident located upon their property.

128.    FERC's deprivation of Plaintiff's protected interest constitutes a violation of Plaintiff's substantive due process rights under the Fifth Amendment to the United States Constitution and a violation of 5 U.S.C. § 706(2)(B).

129.    This Court must enjoin FERC from entering a Certificate or invalidate the Certificate should one have already been issued.

**F.      The FEIS Unlawfully Fails to Consider the Safety of Plaintiffs (5 U.S.C. § 706, 28 U.S.C. § 2201).**

130.    Plaintiffs hereby reincorporate the preceding paragraphs as if fully rewritten herein.

131.    The FEIS does not make any attempt to consider the safety risks associated with potential a pipeline breach resulting from the NGT Project.

132.    The FEIS impermissibly delegates the consideration of safety risks to the Department of Transportation.

133.    The Department of Transportation did not perform any analysis of the proposed pipeline route or review any data related to the proposed pipeline route.

134.    The FEIS simply relied on DOT safety standards for pipelines in general.  No agency of department reviewed the pipeline safety standards as they apply to the NGT Project. This one-size-fits-all approach does not satisfy the "hard look" requirements of NEPA.

135.    This Court must declare the FEIS to be incomplete and must therefore enjoin FERC from issuing a Certificate in reliance upon such FEIS.

**G.      The Conclusions Set Forth in the FEIS Are Arbitrary and Capricious.  This Court Must Set Aside the FEIS. (5 U.S.C. § 706).**

136.      Plaintiffs hereby reincorporate the preceding paragraphs as if fully rewritten herein.

137.      As set forth above, FERC's findings with respect to and decision not to utilize an alternate route suggested by the City of Green (COGAR) is arbitrary, capricious, and unsupported by the facts.

138.      As set forth above, FERC's findings set forth in the FEIS with respect the NGT Project's impact on the Singer Lake Preserve and related properties are arbitrary, capricious, and unsupported by the facts.

139.      As set forth above, FERC's findings set forth in the FEIS with respect the NGT Project's impact on the certain Class 1 Dams are arbitrary, capricious, and unsupported by the facts.

140.      As set forth above, FERC's findings set forth in the FEIS with respect the NGT Project's impact on old growth forests are arbitrary, capricious, and unsupported by the facts.

141.      As set forth above, FERC's findings set forth in the FEIS with respect the NGT Project's impact on property values are arbitrary, capricious, and unsupported by the facts.

142.      As set forth above, FERC's delegation of safety issues to PHMSA in contravention of NEPA is arbitrary, capricious, and unsupported by the facts.

142.      For these reasons, this Court must set aside certain findings in the FEIS, declare the FEIS to be incomplete, and enjoin FERC from issuing a Certificate in reliance upon such FEIS.

**H.      Injunctive Relief Against Nexus.**

143.    Nexus is named as a Defendant as an indispensable party under Federal Rule of Civil Procedure 19.  Nexus may have an interest in the outcome of this litigation.

144.    Nexus as the Applicant for this Project has engaged in activities acting under color of law under the Natural Gas Act.

145.    The Natural Gas Act does not require "good faith" negotiations in appropriations matters as required under Ohio law in such matters.

146.    Nexus has engaged in activities without having been granted a Certificate by FERC that are designed or intended to intimidate and coerce property owners into signing legal documents granting them legal rights over the Plaintiffs by one or more of the following activities:

A.    Trespassing onto their Properties repeatedly when not invited to enter;

B.    Entering with persons carrying firearms and unauthorized uniforms or badges indicating or acting as law enforcement out of jurisdiction or without proper authority;

C.    Sending threatening letters in the U.S. Mail;

D.    Making repeated telephone calls causing telephone harassment;

E.    Making verbal representations and promises that are false and misleading;

F.    Contacting property owners who were represented by legal counsel and making unauthorized communications either through land agents, employees, contractors and attorneys.

147.    In order to preserve the status quo and prevent illegal harassment of property owners, Nexus must be enjoined from these activities.

WHEREFORE, Plaintiffs make the following prayer for relief sought:

1.    That the Court vacate and overturn the FEIS in FERC docket CP16-22-000 issued in this case as arbitrary and capricious.

48

2.      That the Court enjoin FERC from issuing the Certificate in FERC docket CP16-22-000.

3.      That the Court enjoins Nexus from engaging in any activities to obtain access to property, sign legal documents, or communicate with property owners.

4.      That the Court declare the rights of the Parties, including that Nexus is an export pipeline, has not filed an export application, has no legal right to appropriate property or use eminent domain under the NGA, has no public use under the 5th Amendment of the U.S. Constitution, and FERC has violated the substantive and procedural due process rights of Plaintiffs.

5.      Such further relief as the Court deems necessary and just to carry out its order.

6.      Award attorney's fees to Plaintiff's legal counsel pursuant to the Administrative Procedures Act to reimburse and compensate Counsel for bringing this action.

/s/ David A. Mucklow
David A. Mucklow, #0072875
Attorney for Plaintiffs
919 E. Turkeyfoot Lake Road, Suite B
Akron, Ohio 44312
Phone: (330) 896-8190
Fax:    (330) 896-8201
davidamucklow@yahoo.com

/s/ Aaron Ridenbaugh
Aaron Ridenbaugh, #0076823
Attorney for Plaintiffs
Gibson & Moran, LLC
234 Portage Trail
Cuyahoga Falls, Ohio 44221
Phone: (330) 929-0507
Fax: (330) 929-6605
aaron@gibsonmoran.com

/s/ Kevin J. Breen

Kevin J. Breen, #0034670
Kevin J. Breen Co., LLC
3300 West Market Street, Suite 4
Fairlawn, OH 44333
Phone: (330) 666-3600
Fax: (330) 670-6556
kevin.j.breen@gmail.com